NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0335n.06

Case No. 18-2106

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CURTIS PARKS, | ) | |
| | ) | |
| *Petitioner-Appellant*, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ON APPEAL FROM THE** |
| **WILLIS CHAPMAN, Warden,** | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE EASTERN** |
| *Respondent-Appellee*. | ) | **DISTRICT OF MICHIGAN** |

FILED
Jun 09, 2020
DEBORAH S. HUNT, Clerk

Before: BATCHELDER, DONALD, and READLER, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** Curtis Parks, an inmate in a Michigan prison, appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. We AFFIRM.

**I.**

Beverly Jefferson was a 44-year-old woman who lived in an apartment with her three cats. Early one Sunday morning in April 2001, she answered a knock at her door to find an African-American man, Curtis Parks, asking to use her phone. She did not know Parks but let him in. Parks punched her in the face, knocked her to the floor, and raped her. He stayed all day and raped her several times. He broke her belongings, urinated on her bed, and threatened her continually. He told her he had been watching her for a while. Eventually, Parks fell asleep and Jefferson called 911.

When the responding police officer arrived, Parks was in the process of raping Jefferson again. The officer heard Jefferson screaming, kicked in the door, and found Parks on top of her with his pants down, raping her. Parks lunged at the officer who drew his gun and subdued and

arrested Parks. At the emergency room, Jefferson received stitches to close the wounds to her lip, both inside and out. A sexual-assault nurse found "very fresh" injuries to Jefferson's vagina and anus that were typical of forced sex and assault, not consensual intercourse.

In October 2001, the state prosecutor charged Parks with three counts of criminal sexual conduct in the first-degree and tried him to a jury in Kent County, Michigan. It was unknown at the time but was later established that a computer error was causing an underrepresentation of African-Americans in the panels of prospective jurors (venires) being drawn for Kent County trials—African-Americans made up 8.24% of the community but, due to the error, made up only 4.79% of the improperly constructed community-wide pool. For Parks's venire, however, at least four of the 42 (9.52%) prospective jurors were African-American,[1] but the prosecutor removed those four with peremptory challenges (the prosecutor used seven of his 12 peremptory challenges), and the resulting jury was all Caucasian. Parks's defense counsel, who used four peremptory challenges of his own, did not raise any *Batson*[2] claim; to the contrary, he told the court that he was "satisfied" with the empaneled jury.

At trial, Jefferson testified at length and in detail, describing the violence, the repeated rapes, and her call to 911. The responding officer testified about Jefferson's screams, finding Parks on top of her with his pants off, and Parks's lunging at him. The emergency room doctor testified about Jefferson's lip injury, that it was new and needed stitches to close it, and that Parks could not have been unaware of it. And the sex-assault nurse testified about the injuries to Jefferson's vagina and anus, that they were fresh and typical of forced sexual assault, not consensual sex. Parks testified in his defense, asserting that Jefferson was a prostitute who

---

[1] The record established that four excluded jurors were African-American and that the 12 empaneled jurors were Caucasian. It is unknown whether any, or how many, of the other 26 people in the venire were African-American.

[2] *Batson v. Kentucky*, 476 U.S. 79 (1986).

propositioned him and only called the police because she thought he was not going to pay. Parks said he was unaware of Jefferson's bloody lip and denied being on her when the officer arrived or that he had lunged at the officer. The jury convicted Parks on all counts.

On direct appeal, Parks raised a "fair cross section" claim based on the computer error, but the Michigan appellate court found that he had forfeited the claim by failing to raise a timely objection at trial, *i.e.*, before the jury was impaneled and sworn, and had actually affirmatively waived it by "express[ing] satisfaction with the jury's composition." *Michigan v. Parks*, No. 239728, 2003 WL 21958299, at *1 (Mich. Ct. App. Aug. 14, 2003) (per curiam). Parks also raised a *Batson* claim on direct appeal, based on the prosecutor's use of peremptory challenges to remove the four African-Americans from the venire, and the court's empaneling an all-Caucasian jury. The trial transcript and record did not reflect the race of any jurors, but Parks submitted affidavits from the four dismissed African-Americans and from another person who attested to the all-Caucasian jury. The Michigan appellate court found that Parks had similarly forfeited and waived that claim by failing to raise it at trial, but further stated that it was not "clear from the record that the prosecutor used her peremptory challenges in a discriminatory fashion." *Id*. And Parks raised an ineffective-assistance-of-counsel (IAC) claim based on his counsel's failure to make the *Batson* challenge at trial, but the court found "no record of any wrongdoing," and hence no IAC, because the transcript from the jury voir dire did not "indicate that the prosecutor exercised her peremptory challenges to remove African-Americans from the jury because of their race." *Id*. The Michigan appellate court affirmed, *id.* at *3, and the Michigan Supreme Court denied leave to appeal. *Michigan v. Parks*, 677 N.W.2d 27 (Mich. 2004). Parks did not pursue any state post-conviction motions; he next filed a pro se federal habeas petition.

Parks's § 2254 petition raised two claims—*Batson* and fair-cross-section—but recognized that both were procedurally defaulted. He argued that trial counsel's IAC excused the procedural default of the *Batson* claim. The district court denied the IAC claim, finding no evidence of trial counsel's deficient performance, and held the *Batson* claim procedurally defaulted because Parks could not overcome the default without proving IAC. *See Parks v. Warren*, No. 05-10036, 2011 WL 5838486, at *1 (E.D. Mich. Nov. 21, 2011). On the fair-cross-section claim, the court found cause to excuse the default—namely, that the computer error was unknown at the time of Parks's trial—and assumed prejudice, so it appointed counsel for Parks and held an evidentiary hearing. *Id.* Thereafter, the court denied the fair-cross-section claim on the merits, finding that even though the Kent County Court had underrepresented African-Americans in its community-wide jury pool for several months, the racial composition of Parks's venire paralleled the proportion of African-Americans in the community. *Id.*

On appeal here, a prior panel held that it was improper for the district court to *assume* prejudice in order to excuse the procedural default and decide the fair-cross-section claim on the merits, so it vacated the ruling on that claim and remanded for the district court to decide whether Parks had suffered *actual* prejudice to excuse the procedural default. *Parks v. Klee*, 555 F. App'x 573 (6th Cir. 2014). The panel also vacated the ruling on the IAC claim and included it in the remand, explaining that "the district court appears to have overlooked the existence in the record of the voir dire transcript from Parks'[s] state court trial." *Id.*

On remand, the district court recognized, again, that Parks had procedurally defaulted both his fair-cross-section and *Batson* claims. *Parks v. Warren*, 278 F. Supp. 3d 975, 978 (E.D. Mich. 2017). On the fair-cross-section claim, the court found cause but no prejudice "because the trial record plainly depicts a case against [Parks] so strong, and a defense so weak, that it is highly

improbable that an unbiased jury could acquit him." *Id*. at 981. Therefore, the district court denied the fair-cross-section claim based on procedural default. *Id*. at 983.

On the *Batson* claim, Parks asserted that the cause for the default was trial counsel's IAC, citing *Strickland*.[3] *Id*. at 984. But the district court rejected that contention:

> [Parks] is not entitled to relief on his *Batson* and *Strickland* claims, because he has not pointed to any circumstances evident from the record sufficient to make out a *prima facie* claim that the prosecutor's use of peremptory strikes was racially motivated. And because the record discloses no plausible basis for raising a *Batson* objection, [Parks]'s counsel cannot have been ineffective for failing to make one.

*Id*. at 985. Having found no basis for raising a *Batson* challenge, the district court concluded that because there had been no reason for trial counsel to raise the *Batson* challenge, counsel had not performed deficiently, and because counsel's performance had not been deficient, counsel had not rendered ineffective assistance. Parks had thus shown neither cause nor prejudice to excuse his procedural default of the claimed *Batson* violation.

In sum, the district court found that Parks did not and could not point to evidence in "the record sufficient to suggest that the [peremptory] removal of those [four African-American] jurors was 'motivated by race.'" *Id*. at 986. The court specifically listed certain shortcomings in Parks's proof, stating that the record revealed: (1) the race of only the four affiants and that the empaneled jury was all Caucasian, but did not reveal the race of anyone else in the venire who was neither affirmatively removed nor ultimately selected, so there was no proof "that the prosecutor engaged in a 'pattern' of strikes against African-American jurors"; (2) no racial pretext in the prosecutor's voir dire questioning or commentary; and (3) that both sides used peremptory challenges, but neither used them all, and the prosecutor used just four of her seven on African-Americans. *Id*. at 986–87. The district court emphasized that the absence of African-Americans, standing alone,

---

[3] *Strickland v. Washington*, 466 U.S. 668 (1984).

5

does not "support any valid inference of purposeful discrimination." *Id*. at 987. The court acknowledged that the record was silent as to the prosecutor's reasons for removing those jurors, "principally because [Parks]'s attorney did not object to any of the challenges, and at the end of the selection process he stated that 'the defense is satisfied with the jury.'" *Id*. at 984. The court then denied the *Batson* claim after finding that, even if Parks's counsel had raised the claim, the voir dire transcript revealed "plausible non-racial reasons for the exercise of the challenges to the four African-American jurors." *Id*. at 983. Finally, the court denied Parks's request for an evidentiary hearing because his request was based on only "naked speculation," which "does not warrant an evidentiary hearing in a habeas proceeding." *Id*. But the court did grant Parks a certificate of appealability on both the fair-cross-section and *Batson* claims.

Parks moved the district court to reconsider based on the Supreme Court's then-recent decision in *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), which—according to Parks— abrogated the rule laid down in *Ambrose v. Booker*, 684 F.3d 638 (6th Cir. 2012), that required proof of actual prejudice, and required the court to instead presume prejudice on collateral review of any claims implicating structural error. The district court denied the motion, explaining that *Weaver* does not compel that conclusion, and that the Sixth Circuit had rejected that argument in *Carter v. Lafler*, No. 17-1409, 2017 WL 4535932, at *3 (6th Cir. Aug. 30, 2017) (order), and *Wellborn v. Berghuis*, No. 17-2076, 2018 WL 4372196, at *2 (6th Cir. May 16, 2018) (order). *Parks v. Warren*, No. 05-10036, 2018 WL 4478767, at *3 (E.D. Mich. Sept. 19, 2018).

## II.

The district court held that Parks procedurally defaulted two of the claims before the court in this appeal because he failed to raise them in the state trial court. In an appeal from a district

court's finding of procedural default, we review the district court's legal conclusions de novo and its findings of fact for clear error. *Scott v. Houk*, 760 F.3d 497, 503 (6th Cir. 2014).

In short, a § 2254 petitioner is barred from asserting claims in federal court that have been "procedurally defaulted." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). To overcome a procedural default, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

**A.**

The first issue is whether Parks procedurally defaulted his *Batson* claim. Parks argues that his trial counsel was ineffective for failing to raise that claim at voir dire and that IAC demonstrates cause and prejudice to overcome the default. *See Wade v. Timmerman-Cooper*, 785 F.3d 1059, 1077 (6th Cir. 2015) (ineffective assistance of counsel can serve as both cause and prejudice).

Our precedent does not definitively provide the standard of review that we must apply to Parks's argument regarding procedural default. The Michigan appellate court did address Parks's IAC claim on the merits. Ordinarily, then, the Antiterrorism and Effective Death Penalty Act (AEDPA) would govern our review of that claim in this collateral posture. As a result, we could grant relief only if the last reasoned opinion from the state court that adjudicated the challenged issue on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,] or resulted in a decision that was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). But in examining whether a petitioner has shown cause and prejudice to excuse procedural default, "we have sometimes said that AEDPA deference does not cabin our review of the cause and prejudice aspect of procedural default" and have instead applied de novo review. *Williams v. Burt*, 949 F.3d

966, 974 (6th Cir. 2020) (citing *Hall v. Vasbinder*, 563 F.3d 222, 236-37 (6th Cir. 2009)). We need not resolve this issue today, however, as Parks plainly cannot meet the demanding *Strickland* test even on the more lenient de novo standard of review. *See id.*

To prove an IAC claim, the petitioner "must show that [his counsel's] deficient performance prejudiced [his] defense." *Strickland*, 466 U.S. at 687. That is, Parks must show, based on the evidence that was before the state court, *see Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), that counsel's performance was deficient and that deficiency prejudiced his defense.

The allegedly deficient performance is Parks's trial counsel's *decision* not to object to the prosecutor's use of peremptory challenges to remove the four African-Americans from the jury; i.e., counsel's *decision* not to raise the *Batson* challenge. The Michigan appellate court, the district court, and the prosecutor reasoned this way: there is no evidence in the record that race influenced the prosecutor's peremptory removals; therefore the trial court would have denied a *Batson* objection (i.e., the objection would have been futile); therefore trial counsel was not obligated to object (and pursue a futile argument); therefore that *decision* was not necessarily or objectively incorrect; therefore trial counsel did not perform deficiently by deciding not to object; therefore no IAC. Parks attacks the first of that line of falling logical dominoes, insisting that "the record amply establishes a *prima facie* showing of racial discrimination," Apt. Br. at 39 (and at 34 & 37), based solely on the prosecutor's removal of the four identified African-Americans and on the all-Caucasian jury. The parties dispute whether the case law supports or rejects this theory, but we can sidestep that dispute here by assuming that *if defense counsel had raised it* to the trial judge, the judge would have asked the prosecutor for an explanation (i.e., would have found *Batson*'s step one—the prima facie case—satisfied and proceeded to step two).

But we must start the analysis with *Strickland* rather than *Batson*, and the first question therefore is whether defense counsel's decision might have been reasonable under prevailing professional norms. *Strickland*, 466 U.S. at 688. Maybe it was a strategic decision because defense counsel did not want those four on the jury anyway, or maybe their removal would make room for other potential jurors whom defense counsel found more favorable. We do not know and should not speculate. But that does not mean that we should ignore or discredit defense counsel's affirmative statement to the trial court that he was "satisfied with this jury"; that is, defense counsel was expressly "satisfied" with an all-Caucasian jury, for whatever reason. Even if that was a bad decision, "errors of tactics or omission do not necessarily mean that counsel has functioned in a constitutionally deficient manner." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

Moreover, even if we assume that, in this case, counsel's performance (i.e., decision to forgo the *Batson* challenge) was outside "the wide range of reasonable professional assistance," Parks must still demonstrate that there is a reasonable probability that, due to that decision, the result of the trial would have been different. *Strickland*, 466 U.S. at 689, 694. That is, Parks must show that if the trial court had upheld the *Batson* challenge, or if the prosecutor had withdrawn the peremptory strikes, and the four African-Americans had sat on Parks's jury, the outcome of his trial would have been different. *See id*. And he cannot. The case against Parks was so strong and his defense was so weak, that no unbiased juror would have voted acquit him.

Because Parks cannot prove IAC on de novo review, let alone AEDPA review, he cannot overcome his procedural default of his *Batson* claim and we have no authority to consider the *Batson* claim in this appeal.

**B.**

The next issue in this appeal is whether the district court erred by denying the fair-cross-section claim because it was procedurally defaulted. Parks contends that he has overcome his procedural default of the fair-cross-section claim because he had cause for not raising it, namely, that he was not aware of it (no one was), and he can prove prejudice "because fair-cross section violations always render trials fundamentally unfair." But, as explained above, the prior panel decision held that Parks had to prove "actual prejudice," *Parks*, 555 F. App'x at 573, and the district court found that he could not do so. Before that appeal, the district court found that even though African-Americans had for several months been underrepresented in the jury pools of the Kent County Court, there was no prejudice to Parks because the racial composition of his venire (at least 9.52% African-American) exceeded the proportion of African-Americans in the community (8.24%). *Parks*, 2011 WL 5838486, at *3. On remand, the district court found no prejudice "because the trial record plainly depicts a case against [Parks] so strong, and a defense so weak, that it is highly improbable that an unbiased jury could acquit him." *Parks*, 278 F. Supp. 3d at 981.

Parks moved the district court to reconsider based on the Supreme Court's then-recent decision in *Weaver*, 137 S. Ct. 1899, which Parks argued had abrogated the rule laid down in *Ambrose*, 684 F.3d at 650-51 (requiring proof of actual prejudice "regardless of the nature of the underlying constitutional claim"), and instead—Parks contends—requires that the court presume prejudice on collateral review of any claims implicating "structural error." *See Parks*, 2018 WL 4478767, at *3. That is the argument he now presses in this appeal.

The *Weaver* Court, despite limiting its holding to its particulars (i.e., a claim of IAC for failure to raise a structural error in "the context of trial counsel's failure to object to the closure of

the courtroom during jury selection," *Weaver*, 137 S. Ct. at 1907), described generally three kinds of structural error, *id.* at 1908 (i.e., error as to a right that protects the defendant from some interest other than erroneous conviction; error the effects of which are too hard to measure; error that always results in fundamental unfairness). The Court nonetheless held that IAC on a public-trial claim did not result in fundamental unfairness. Parks claims that a violation of the fair-cross-section right always and necessarily renders a trial fundamentally unfair, so *Weaver* means that he need not prove actual prejudice.

But that is not a reasonable reading of *Weaver*. *Weaver* stands for the idea that finality and judicial economy can trump even structural error; so, when a defendant raises a structural error on collateral review rather than on direct review, he must prove actual prejudice, even though he would not have had to prove actual prejudice if he had raised it on direct review. That is because, if the error is one that results in fundamental unfairness (e.g., denial of counsel, no reasonable-doubt instruction, biased judge), actual prejudice should be easy to show and when a defendant raises the error immediately to the trial court, the court can correct the mistake; or, when it is raised on direct review, only minimal time will have passed, so witnesses and evidence are still available. But when the error is raised on collateral review, it is a larger burden on the system and on the concept of fairness. *Id.* at 1912. All in all, *Weaver* does not support Parks's contention that he need not prove actual prejudice solely because a fair-cross-section violation is structural error.

Because Parks has not proved and cannot prove actual prejudice, he cannot overcome his procedural default and the panel has no authority to decide his fair-cross-section claim.

## C.

The final issue in this appeal is whether Parks is entitled to an evidentiary hearing in federal court. Parks insists that an evidentiary hearing in federal court is warranted to force the prosecutor

11

to state specific reasons for the peremptory removals, which Parks could then attempt to construe as sufficiently incriminating to prove the prima facie case of racial discrimination for his *Batson* claim. The district court correctly rejected this as rank speculation.

Regardless, Parks defaulted his *Batson* claim. Even if he could provide actual evidence of racial discrimination, because he defaulted his *Batson* claim, he could not obtain habeas relief on it. Therefore, no hearing is warranted.

## III.

For the foregoing reasons, we AFFIRM the judgment of the district court.

**BERNICE BOUIE DONALD, Circuit Judge, concurring in the judgment.** I agree with the majority that Curtis Parks is unable to show actual prejudice for either claim because of the strength of the case against him and would affirm the judgment of the district court. I write separately, however, to discuss the majority's failure to address the constitutional guarantee to be tried by an impartial jury and the court system's inability to protect Parks. Parks was tried and convicted by an all-white jury, *Parks v. Warren*, 278 F. Supp. 3d 975, 987 (E.D. Mich. 2017), resulting from the prosecutor's use of four of her seven peremptory challenges to remove every African-American juror from Parks' jury panel and the now well-documented Kent County computer glitch.[1] He raised both procedurally defaulted claims in his 28 U.S.C. § 2254 petition.

I.

To show that Parks' trial counsel's performance was deficient under *Strickland* for failure to raise a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), Parks must show that his "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. We have previously acknowledged the possibility that the failure to raise a *Batson* challenge constitutes deficient performance. *See Mitchell v. Rees*, 114 F.3d 571, 579 n.13 (6th Cir. 1997) (stating that if the petitioner was able to demonstrate that his *Batson* claim had merit,

---

[1] Many criminal defendants were affected by the glitch, which we have previously addressed in our prior opinions:

> On July 30, 2002, the Grand Rapids Press reported that a computer glitch had an impact on Kent County's system for selecting jury venires. The glitch was introduced accidentally by the county when it assumed control of the jury selection computer program from a private vendor in April 2001. The problem came to light in 2002, when a local high school teacher, Wayne Bentley, completed a study of minority representation on Kent County juries. Bentley found that the underrepresentation of minorities was statistically significant, and shared his findings with county officials. The county subsequently conducted an internal study that revealed that "nearly 75 percent of the county's 454,000 eligible residents were excluded from potential jury pools since spring 2001" and that "[m]any blacks were excluded from . . . jury pools due to a computer glitch that selected a majority of potential candidates from the suburbs." The chief judge of the Kent County Circuit Court, George Buth, stated, "There has been a mistake—a big mistake."

*Ambrose v. Booker*, 684 F.3d 638, 640-41 (6th Cir. 2012) (alteration and ellipsis in original).

"he might also be able to prevail on [his] related ineffective assistance claim") (abrogated on other grounds by *Abdur'Rahman v. Bell*, 226 F.3d 696, 705 (6th Cir. 2000)). The majority, however, contends that counsel's failure to raise a *Batson* challenge may be considered a "strategic decision" because defense counsel expressed that he was "satisfied" with the jury when he neglected to exercise his remaining peremptory challenges. Op. at 9. This defies logic! The majority would see to it that the courthouse is effectively closed to any ineffective assistance of counsel claim based on counsel's failure to raise a *Batson* challenge because counsel's failure could always be described as "strategic." Counsel that declines to raise a *Batson* challenge, or some other issue regarding the sufficiency of the jury, is necessarily "satisfied" with the jury in order for the jury to be empaneled and the trial to move forward. Not only that, this rationale can be easily applied to *any* ineffective assistance of counsel claim; as long as counsel was "satisfied" with their performance, any decisions must have been "strategic" and therefore fall short of constitutional deficiency under *Strickland*.

Moreover, even in the extremely rare situation wherein counsel's active decision not to raise a *Batson* challenge could be considered strategic, counsel must still be guided by ensuring "a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of the legal representation . . . . The purpose is simply to ensure that criminal defendants receive a constitutionally fair trial." *Id.* at 689. Therefore, because even a strategic decision to forgo challenging the discriminatory use of a peremptory challenge nevertheless fails to provide the defendant with a fair trial, I would hold that the failure to raise a meritorious *Batson* challenge is outside the range of reasonable trial strategy.

It is counsel's duty to ensure that his client faces a jury constructed in a nondiscriminatory manner. "Those on the venire must be 'indifferently chosen,' to secure the defendant's right under the Fourteenth Amendment to 'protection of life and liberty against race or color prejudice.'" *Batson*, 476 U.S. at 86-87 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 309 (1879)). By neglecting to raise a meritorious *Batson* challenge, counsel denies the defendant the protection to ensure this right. Not only that, the use of *Batson* challenges also "enforces the mandate of equal protection and furthers the ends of justice." *Id.* at 99. The duty to uphold this fundamental principle is as much the responsibility of a nondiscriminatory prosecution as it is a vigilant defense.

A.

Therefore, the first step in deciding Parks' ineffective assistance of counsel claim is to determine if a *Batson* challenge to the prosecutor's use of peremptory strikes had merit. The Equal Protection Clause guarantees "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Id.* at 85-86. This right is violated by the purposeful, racially-discriminatory use of peremptory challenges to remove certain persons from the jury panel. *Id.* at 86. In order to challenge a party's use of peremptories, the opposing party must follow the three-step process outlined in *Batson*. First, the opponent must make out a prima facie case of racial discrimination. *Purkett v. Elem*, 514 U.S. 765, 767 (1995). Next, the proponent must offer a race-neutral explanation for the use of each peremptory strike in question. *Id.* Finally, the trial court must decide whether there has been purposeful discrimination based on whether it finds the proponent's race-neutral explanations credible. *Id.* at 767-68.

Because Parks' trial counsel did not raise a *Batson* challenge, there is no record of the prosecutor's explanations for the removal of the four African-American jurors. Nevertheless, to show deficient performance, Parks need only show that he can satisfy step one of *Batson*—that he

15

can establish a prima facie case of racial discrimination—because that is the only aspect of *Batson* impacted by the performance of trial counsel. Step two is entirely the province of the prosecutor, and step three is a credibility determination of the prosecutor's reasoning by the court.

"To establish a prima facie case, the defendant must show that (1) he is a member of a cognizable racial group; (2) the prosecution has removed a member of his race; and (3) circumstances raise an inference that the removal was motivated by race." *United States v. Lawrence*, 735 F.3d 385, 443 (6th Cir. 2013). Parks is African-American, and there is no dispute that the prosecutor used four peremptory strikes on African-American jurors. Therefore, the only question remaining is whether Parks has overcome his burden in establishing that the circumstances here raise an inference that the jurors' removal was motivated by race.

1.

In reviewing the voir dire transcript, we can discern the following information regarding the makeup of Parks' jury. The prosecutor exercised seven peremptory challenges in the following order: Gregory Scrivens, Thomas Zandbergen, Roger Elliot, Ahmed Shabazz, Kelli Adame, Aria Moody, and Melanie Gipson[2]. Parks' counsel exercised six peremptory challenges: Susan Bowers, Philip Hack, Deborah Enos, Keith Williams, Richard Brancato, and Charles Rossman. Although it is unclear how many peremptory challenges were allowed to each side here, Michigan law generally allows twelve. Mich. Ct. R. 6.412(E).

During Parks' state court appeal, he obtained affidavits from three of the stricken jurors and an individual who observed the trial and was able to assess the composition of the selected jury.[3] Ahmed Shabazz, Aria Moody, and Melanie Gipson all stated that they are African-American

---

[2] Gipson is misspelled as "Gibson" in the transcript.

[3] The government does not dispute any of the statements within the affidavits.

and were removed from the jury panel. Additionally, Melanie Gipson indicated that Gregory Scrivens, struck among the first group of peremptories used by the prosecutor, is her cousin and is also African-American. Finally, Reverend Steven Vanhuizen stated that he observed the trial and that Parks had been tried before an all-white jury.

Parks argues that the prosecutor's use of peremptory challenges to remove all of the African-American jurors from the jury panel mirrors *Batson*'s reference to a "pattern" of strikes against African-American jurors which "might give rise to an inference of discrimination." 476 U.S. at 97. Specifically, Parks points to this Court's language in *United States v. Sangineto-Miranda*, 859 F.2d 1501 (6th Cir. 1988), to show why the prosecutor's use of peremptories here creates clear inferences of discrimination:

> If, after the jury selection process has ended, the final jury sworn has a percentage of minority members that is significantly less than the percentage in the group originally drawn for the jury (or in the whole jury pool or in the district), then that would be a factor pointing toward an inference of discrimination. If, on the other hand, the percentage of minority members in the ultimate jury is the same or greater, that would be a factor tending to negate the inference of discrimination.

> If there are minority members on the jury but the prosecutor did not use all its peremptory challenges, that would be a factor tending to refute discrimination. However, if all the prosecutor's challenges were used, that fact would point toward an inference of discrimination.

*Id.* at 1521-22. The percentage of African-Americans in the jury pool was at least 9.5% (4/42), which, despite the computer glitch, was higher than the 8.24% in the community. But, after the prosecutor's removal of all the African-American jurors, Parks was left with 0% African-Americans—an all-white jury. And unlike in *Sangineto-Miranda*, where the final jury consisted of some minority members despite the prosecutor's ability to remove them with unused peremptory challenges, *id.*, in Parks' case the prosecutor continued to use her peremptory challenges until every African-American juror was removed.

17

2.

The government contends that, regardless of these inferences, the prosecutor's non-discriminatory reasoning for removing each African-American juror is evident from the voir dire transcript. While Parks is correct to point out that it is impossible to know the prosecutor's intent without reaching step two, *Batson* is clear that courts "should consider all relevant circumstances" in determining whether the opponent has met his prima facie burden. 476 U.S. at 96. In addition to the pattern of strikes previously discussed, these circumstances include whether "the prosecutor's questions and statements during *voir dire* examination and in exercising [her] challenges may support or refute an inference of discriminatory purpose." *Id.* at 97.

The prosecutor asked a number of questions of the prospective jurors, including some already raised by the court: (1) If anyone in their home was employed outside the home? (2) If anyone had an occasion to assess a dispute in which one person was telling the truth and the other was lying? (3) How many had friends or relatives who had been victims of criminal sexual conduct? (4) If anyone was ever accused of a crime? (5) If anyone knew someone who had been charged with a crime or falsely accused of anything? (6) Whether anyone required 100% certainty to convict someone of a crime? (7) If anyone believed that a victim must resist to be guilty of rape? (8) Whether anyone may be hindered in their deliberations because of their discomfort with the topic or any other reason why they could not be fair or impartial?

### i. Gregory Scrivens

Gregory Scrivens was the first African-American juror removed from the jury panel. He was removed during the prosecutor's first use of peremptory challenges, along with two other jurors. The only information Scrivens provided to the court was that he was a mechanical engineer and worked for Rapistan Systems.

The government contends that Scrivens' employment as an engineer refutes an inference of a discriminatory purpose for his removal and cites several cases discussing the frequent removal of engineers from the venire because of their mathematically-framed thought processes. The fact that another juror with the same profession[4] was not removed by the prosecutor, however, supports a finding of discriminatory intent. Like Scrivens, Keith Williams[5] was a member of the original jury panel and informed the court that he was an electrical engineer. The prosecutor had two opportunities to remove Williams and chose not to do so before he was eventually struck by Parks' counsel. The voir dire transcript offers no material distinction between the prosecutor's decision to remove Scrivens and her decision not to remove Williams. This finding supports a showing of discriminatory intent as to Scrivens' removal.

### ii. Ahmed Shabazz

Ahmed Shabazz was the second African-American juror removed by the prosecutor. Shabazz was added to the venire after the prosecutor's first use of peremptory challenges. Shabazz indicated to the court that he is a case manager for Exodus Ministries Network and had worked with several people who have been convicted of crimes involving criminal sexual conduct but never any victims of such crimes. When the prosecutor was given a chance to question Shabazz, she asked him whether he would be uncomfortable using himself as a juror if he were the prosecutor. Shabazz responded that he did not think so, and the prosecutor ceased her questioning.

Shabazz was then removed by the prosecutor during her next available peremptory challenge. The fact that someone has spent a significant amount of time around defendants, but not victims, presents a plausible nondiscriminatory reason to remove that person from the jury.

---

[4] Actually, two jurors in addition to Scrivens stated their professions as engineers, but one of them (Daniel Wildey) was removed for cause before either side had a chance to execute a peremptory challenge.

[5] There is no evidence indicating Williams' race.

Therefore, Shabazz's statements do not raise an inference of discriminatory intent as to his removal.

### iii. Aria Moody

Aria Moody was the third African-American juror removed. Prior to Moody's arrival to the venire, the prosecutor indicated that she was satisfied with the construction of the then all-white jury panel. But Parks' counsel executed one of his peremptory challenges, which brought Moody onto the jury panel. Upon being selected, Moody indicated to the court that she lives near where the encounter occurred and may have heard about it when it first happened. The only question that the prosecutor asked of Moody was whether she could convict on less than 100% evidence. Upon Moody's indicating that she could, the prosecutor executed a peremptory challenge to remove Moody from the jury.

Given that Moody's answer to the prosecutor's question seems to show that she was the type of juror that a prosecutor would want on a jury, it is curious that only after this question did she remove Moody. Furthermore, although the circumstances of their potential knowledge were different, the prosecutor chose not to remove another juror, Deborah Enos.[6] Enos was added to the jury after another juror was removed for cause, prior to the prosecutor's second set of peremptory challenges. Enos indicated that she may have seen Parks on television or elsewhere because she recognized his name and his face. Although Enos never served on Parks' jury because she was later removed by Parks' counsel, the prosecutor had the first opportunity to remove her and declined to do so. Moody's potential knowledge of the case would normally refute an inference that she was removed for a discriminatory purpose, but the prosecutor's failure to remove

---

[6] There is no evidence indicating that Enos, previously in the jury pool with Moody, is African-American.

Enos, who indicated similarly limited knowledge of the case, negates that premise and supports a finding of discriminatory intent.

### iv.  Melanie Gipson

Melanie Gipson was the final African-American juror removed.  Gipson was added to the jury panel after the removal of Moody.  When Gipson was questioned by the court, she explained that she had a cousin who had been the victim of criminal sexual conduct.  Following the court's inquiries, the prosecutor asked Gipson whether she believed a victim should have to resist and Gipson said that she did.  After the prosecutor explained that Gipson's belief was contrary to the law, Gipson agreed that she could follow the law, but also stated that she would need 100% certainty to convict someone.  Gipson was then removed from the jury by the prosecutor.  Following Gipson's removal and the addition of a white juror, the prosecutor stated that she was once again satisfied with the all-white jury.

Here the prosecutor was consistent in that she had previously removed Thomas Zandbergen after he had indicated that he believed a victim must resist.  This circumstance, when combined with the knowledge that Gipson would require 100% certainty to convict, does not raise an inference of discriminatory intent.

3.

Considering all relevant circumstances surrounding the prosecutor's use of peremptories to remove *every* African-American from the jury panel—one-by-one—until Parks was left with an all-white jury, Parks has met his burden in establishing a prima facie case that the prosecutor's

use of peremptory challenges was discriminatory. I find no reasonable argument that Parks' counsel's performance was not deficient under *Strickland*.[7]

First, the sheer numbers involved make out a strong prima facie case of discrimination. Although we cannot be certain about the number of African-American jurors drawn from the venire on the initial jury panel, the various affidavits show that there were at one point or another a total of four on the panel.[8] As in *Batson*, each African-American juror was removed until Parks faced an all-white jury. 476 U.S. at 83 ("The prosecutor used his peremptory challenges to strike all four black persons on the venire, and a jury composed only of white persons was selected."). This suggests a pattern to eliminate African-Americans from the jury panel.

Second, what can be gathered from the voir dire transcript does little to refute the inference that the prosecutor's strikes were used in a racially discriminatory manor. While the circumstances surrounding the removal of Shabazz and Gipson, when analyzed in a vacuum, do not suggest discrimination, the record does nothing to refute inferences that the removal of Scrivens and Moody were the product of purposeful discrimination. The fact that the prosecutor exercised peremptory challenges to remove Scrivens and Moody from the jury panel but not two similarly situated jurors is enough to raise an inference of discrimination.

> It is well established that a *Batson* violation may be shown by disparate treatment of white and minority jurors—that is, if a side-by-side comparison[] of some black [potential jurors] who were struck and white ones who were not shows that the only material distinction between the removed black and the retained white individuals is their race. In conducting a comparative juror analysis, the compared jurors need not be similarly situated in all respects. In fact, the empaneled white jurors need

---

[7] Like the majority, I take no position on whether AEDPA deference applies to Parks' *Batson* claim. I find that Parks' counsel's performance was deficient even under the more demanding standard of *Strickland* through the lens of AEDPA. *See Harrington v. Richter*, 562 U.S. 86, 105 (2011).

[8] Moody stated in her undisputed affidavit that she "was one of three African-Americans in the jury pool" because she had seen only two other African-Americans in the pool. The original jury panel also included at least one African-American, Scrivens, who was removed from the panel before Moody moved from the pool to the panel.

> not even match the stricken black venirepersons in all of the characteristics the prosecution identified in striking the black venirepersons.

*United States v. Atkins*, 843 F.3d 625, 631 (6th Cir. 2016) (internal citations and quotation marks omitted, alterations in original). While there is an argument that Moody and Enos' potential proximity to some aspects of the case are distinct, there is no discernible difference between Scrivens and Williams. The only relevant information revealed by both is that they were employed as engineers. Scrivens, an African-American, was removed during the prosecutor's first opportunity to execute a peremptory challenge and Williams was not removed during either of the prosecutor's first two chances to exercise peremptories. "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)).

Finally, although the disparate treatment of even one pair of similarly situated jurors is enough to satisfy the first step of *Batson*, the timing of the prosecutor's use of challenges leaves no doubt. Each time an African-American juror was added to the jury panel, the prosecutor exercised a peremptory challenge to remove that juror. Scrivens was presumably the only African-American on the initial panel. He was removed in the prosecutor's first set of peremptory challenges. Before the prosecutor was able to execute any more challenges, Shabazz was added to the jury panel. Shabazz was removed with the prosecutor's second set of challenges. When the prosecutor was again given an opportunity to use her remaining peremptory challenges, faced with a presumably all-white jury,[9] she stated that she was satisfied with the jury. Then, following Parks' counsel's removal of a different juror, Moody was added. The prosecutor removed Moody at her next opportunity and then repeated the same action after Gipson took Moody's place. A white

---

[9] The only potential juror whose race was unknown from the panel at that time was Brancato. There is no evidence indicating that Brancato, previously in the jury pool with Moody, is African-American.

juror was added in Gipson's place, and the prosecutor was once again content with an all-white jury.

B.

To be entitled to relief,[10] however, Parks must show actual prejudice because his real claim lies under *Strickland*. Despite the majority's one-sided portrait of the underlying facts of the case,[11] I agree that Parks fails to show actual prejudice. Although there were only two witnesses to the encounter, and both stuck to their versions of the facts, Jefferson's account is far more

---

[10] Parks maintains that he is entitled to an evidentiary hearing to establish a *Batson* violation. The government contends that an evidentiary hearing cannot be held due to the amount of time that has passed since the trial (over eighteen years) and the Supreme Court's decision in *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011) (barring evidentiary hearings in federal court where a state court has already ruled on the merits). Passage of time arguments aside, I agree with the majority that we need not decide whether an evidentiary hearing is precluded, not because a hearing could only seek "rank speculation," Op. at 12, but because Parks has already succeeded in showing what an evidentiary hearing would set out to find—that his trial counsel's performance was deficient.

[11] A broader rendition of the facts is necessary to assess the prejudice prong. Most of the trial focused on the conflicting testimonies of Parks and the victim, Beverly Jefferson. Jefferson testified that, in the early morning of April 22, 2001, she awoke to an unknown man (Parks) knocking on her door. Upon answering the door, Parks asked to use Jefferson's phone, and Jefferson showed him inside her apartment. After using the phone, Jefferson testified that Parks hit her in the mouth several times and told her to remove her clothes or else he would strike her again. Parks then forcibly engaged in non-consensual vaginal intercourse with Jefferson until she managed to secure a knife from the kitchen. Following a brief struggle, Jefferson handed the knife to Parks because Parks threatened to destroy her possessions. Parks then penetrated Jefferson (anally and orally), but he eventually fell asleep on Jefferson's bed as she performed oral sex on him, during which time Jefferson called 911 and indicated that she had been raped. Parks awoke before the police arrived and continued to rape Jefferson until Jefferson heard the police at her door and screamed for them to enter. After hearing her pleas for help, the police kicked in the door and arrested Parks just prior to 9:00 A.M.

Parks testified to a very different set of events. According to Parks, he was on his way home after staying up with his friends all night and purchasing marijuana, which he smoked while he walked home. As he was walking, Parks heard Jefferson call out to him from the door of her apartment building. Jefferson asked Parks if he had any "dope." Parks informed her that he did not, and Jefferson proceeded to offer him sex in exchange for $20. Although Parks explained that he only had $10 and began to leave, Jefferson relented and agreed to the lower amount. At that point, the two walked up to Jefferson's apartment and began talking. Jefferson excused herself to get ready and proceeded to smoke something that Parks could only describe as not a cigarette. While Jefferson was getting ready, Parks started to call his cousin from her phone but decided against it.

According to Parks, once Jefferson was ready, she motioned him to the bed, and they engaged in intercourse. Parks eventually dozed off while Jefferson was performing oral sex on him and later awoke to see Jefferson sitting at her window. Parks confronted Jefferson, and she accused him of lying about how much money he had. Parks then agreed to pay Jefferson $20 if she would "let [him] finish," and the two once again engaged in consensual intercourse until the police arrived.

24

credible because, unlike Parks', her version corroborates their interactions with the police and the physical evidence.

First, it is certain that, on the morning of April 22, 2001, Jefferson called 911 and reported that she had been raped by Parks. Parks posits that perhaps Jefferson called 911 because she was displeased with the fact that Parks had fallen asleep while she performed oral sex or that she believed Parks was not going to pay her as he had promised. To be sure, Parks does not claim to know the reason that Jefferson called the police claiming that she had been raped, but his potential explanations seem much less plausible than the more straightforward motive of a victim of an ongoing sexual assault calling 911 to report it.

Second, when officers arrived, Jefferson had a large gash on the inside of her lip which required between seven and fourteen stitches. The laceration was treated by an emergency physician who stated that the wound appeared to be less than twelve hours old. Parks claims that he never struck Jefferson and that he was unaware of the laceration inside her mouth. Again, Parks' description seems less plausible. It is unlikely that someone would consensually engage in intercourse with such a significant wound or that Parks would never have noticed the blood which Jefferson testified dripped onto her clothes and furniture.

Third, Jefferson was examined by a sexual assault nurse examiner the same morning who discovered two abrasions and one laceration on the outer portion of her vagina and a hemorrhoidal tag and a laceration on the outer portion of her anus. The nurse found the injuries to be "very consistent" with forced sex but was unable to rule out the possibility that the injuries were caused by rough sex. Like the comparison between their conflicting accounts regarding the wound to Jefferson's mouth, it is unlikely that someone with such significant injuries would want to continue to engage in the same conduct that caused or would exacerbate those injuries.

Additionally, while Parks' character witnesses (a former employee in charge of neighborhood outreach at Parks' church and his sister) painted a picture of someone not capable of committing the acts alleged by the State, this testimony cannot overcome the physical evidence against Parks. In sum, the case against Parks is strong enough, such that he cannot show actual prejudice to "undermine confidence in the outcome of the trial." *Strickland*, 466 U.S. at 694. Therefore, Parks is not entitled to habeas relief pursuant to his *Batson*/*Strickland* claim.

## II.

As for Parks' fair cross-section claim, there is no dispute that Parks' claim that his jury pool was not drawn from a fair cross-section of his community was meritorious. Like other defendants who were subject to the Kent County computer glitch, Parks' claim is not that his particular venire was unfair, but that the pool from which the jury was drawn was unfair. *See Ambrose*, 684 F.3d at 645. "The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury *drawn from sources reflecting a fair cross section of the community*." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (emphasis added). By going to trial, Parks put his trust in the fairness of the procedures of the 17th Judicial Circuit Court (Kent County, Michigan). The Kent County Court's systematic exclusion of minority jurors abused Parks' trust and failed to safeguard that which every criminal defendant is guaranteed by the Sixth Amendment: a jury drawn from a source representing a fair cross-section of the community. U.S. Const. Amend VI; *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975) ("We accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment."); *Brown v. Allen*, 344 U.S. 443, 474 (1953) ("Our duty to protect the federal constitutional rights of all [requires that] the source [of jurors] reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty.").

Moreover, it is clear that Parks' procedural default should be excused because the Kent County computer glitch, which caused the systematic underrepresentation of African-Americans in jury pools from 2001 to 2002,[12] was not discovered until after his conviction. I agree with the majority, however, that *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), does not relieve Parks' burden of showing prejudice,[13] and that he remains bound by our holding in *Ambrose*, applying the actual prejudice standard. 684 F.3d at 640. Therefore, like his *Batson/Strickland* claim, because Parks has not shown actual prejudice, he is not entitled to relief.

---

[12] Research from the Kent County Jury Management System Report indicates that the absolute disparity (the difference between the percentage of jury-eligible African-Americans in the County and in the jury pool) was 3.45% (African-Americans made up approximately 8.24% of the County compared to their actual jury pool representation of 4.79%) and the comparative disparity (the absolute disparity relative to the percentage of jury-eligible African-Americans in the County) was 42% (3.45% divided by 8.24%). *Ambrose*, 684 F.3d at 642-43.

[13] Parks points out that the Supreme Court was clear that their holding applies "only in the context of trial counsel's failure to object to the closure of the courtroom during jury selection[,]" *Weaver*, 137 S. Ct. at 1907, and that the Court left open the possibility that there may be situations in which a more egregious error requires automatic reversal, or, at least, a minimal showing of actual prejudice despite being procedurally defaulted. *Id.* at 1913. Parks argues that his claim differs from Weaver's in two material aspects and, therefore, falls into the category of claims which require automatic reversal. First, Parks' claim is procedurally defaulted, not due to trial counsel's error, but because the error was not revealed until the publication of the Grand Rapids Press report long after the trial. Second, the error here is more egregious. Parks' claim is based on the violation of his right to a jury pool drawn from a fair cross-section of the community—an error involving a greater level of fundamental unfairness than in *Weaver*.

I agree with Parks that the circumstances surrounding the procedural default and error in *Weaver* do not implicate the same level of fundamental unfairness he faces here. "The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge." *Taylor*, 419 U.S. at 530 (citing *Duncan v. Louisiana*, 391 U.S. 145, 155-56 (1968)). A jury drawn from only certain segments of the community fails to provide the impartiality necessary to sustain a judicial system based on trial by jury. It is every trial court's constitutional duty to ensure this impartiality.

Unfortunately for Parks, the Supreme Court was clear that *Weaver*'s scope is limited: "[T]his opinion does not address whether [a particular structural error causing fundamental unfairness] should be [assessed] different[ly] if the errors were raised . . . in an ineffective-assistance claim on collateral review." *Weaver*, 137 S. Ct. at 1912. Despite Parks' arguments to the contrary, *Weaver* declined to address the proper standard when faced with a claim such as his or the petitioners' in *Ambrose*. We are therefore bound by precedent to conclude that Parks must show actual prejudice. There may be substantial merit to the application of *Weaver*'s fundamental error analysis to Parks' fair cross-section claim, but a panel of this court cannot overrule *Ambrose*. This requires an inconsistent decision of the Supreme Court—which *Weaver* is not—or a decision of the en banc court. *See Brumbach v. United States*, 929 F.3d 791, 795 (6th Cir. 2019); *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985).